# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

P.K.W.G., a minor child, by and
through his Parent and Natural
Guardian, Gwendolyn Gilmore,

                Plaintiffs,

     v.

Independent School District No. 11,
Anoka-Hennepin School District;
Anoka-Hennepin Board of Education;
Mark Sullivan, Chair and Executive
Officer; and Roger M. Giroux,
Superintendent, in their representative
capacities,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 07-4023 ADM/AJB

_____

Amy J. Goetz, Esq., School Law Center LLC, St. Paul, MN, argued on behalf of Plaintiffs.

Timothy R. Palmatier, Esq., Kennedy & Graven, Chartered, Minneapolis, MN, argued on behalf of Defendants.

_____

## I. INTRODUCTION

On February 28, 2008, the undersigned United States District Judge heard oral argument

on the Cross-Motions for Judgment on the Record of P.K.W.G. (the "Student"), a minor child,

by and through his parent and natural guardian, Gwendolyn Gilmore (the "Parent") (collectively

"Plaintiffs") and Defendants Independent School District No. 11, Anoka-Hennepin School

District; Anoka-Hennepin Board of Education; Mark Sullivan; and Roger M. Giroux

(collectively the "District") [Docket Nos. 17 and 13]. Plaintiffs seek reversal of a decision by

Administrative Law Judge Linda F. Close (the "ALJ"), pursuant to the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1487. The ALJ determined that the

District complied with its obligations under IDEA by providing the Student a free appropriate

public education during the 2005-2006 school year.  For the reasons set forth herein, Plaintiffs'

Motion is denied and the District's Motion is granted.

## II.  BACKGROUND

**A.     The IDEA**

The IDEA requires a school district that accepts federal funds to provide disabled

children within its jurisdiction a "free appropriate public education" ("FAPE").  20 U.S.C.

§§ 1400(d)(1)(A), 1412(a)(1)(A).  To provide a FAPE, a school must formulate an

individualized education program ("IEP") tailored to the disabled child's unique needs.  20

U.S.C. §§ 1412(a)(4), 1414(d)(1)(A).

Parents who are dissatisfied with the substance or implementation of their child's IEP

may request a state administrative due process hearing before an independent hearing officer.

20 U.S.C. § 1415(f); Minn. Stat. § 125A.09 (2002).  In Minnesota, a party may appeal the

hearing officer's decision to either federal district court or the state court of appeals.  20 U.S.C.

§ 1415(i)(2)(A); Minn. Stat. § 125A.091, subd. 24.

**B.     Factual Background**

The due process hearing in this matter was held on April 23 and 24, and May 16 and 17,

2007.  The ALJ's June 26, 2007, decision, which is attached as Appendix A, thoroughly sets

forth the relevant facts.  Therefore, only a shorter account of the relevant facts is provided here.

### 1.      The Student's Education History Prior to the 2005-2006 School Year

The Student lives within the District with his mother and siblings.  Ex. 73 at 0018.[1]  The

Student has an extensive history of behavior and learning problems.  Dr. Richard Ziegler ("Dr.

Ziegler"), a neuropsychologist, has diagnosed the Student with Attention Deficit Hyperactivity

Disorder—Hyperactive Impulsive Type (by history); Reading Disorder/Dyslexia; Disorder of

Written Expression; Mathematics Disorder; and Oppositional Defiant Disorder.  Id. at 0025.

In early elementary school, the Student was placed in a Level IV Emotional Behavioral

Disorders ("EBD") program and he received homebound schooling beginning at age seven.  Ex.

74 at A0416.  By the fifth or sixth grade, while enrolled in the ECHO Program at Southwood

Elementary School, the Student's behavior caused him to be physically restrained at times.

Ex. 73 at 0014.

In the fall of 2002, the Student transferred to the Explore Program at Eliot Middle School

for his seventh grade year.  Ex. 74 at A0416.  Because of poor attendance, behavior, and

progress, the Student's IEP team switched him from full-day to half-day attendance.  Id.  During

his ninth grade school year in 2004-2005, the Student's behavior included verbal and physical

abuse of students and teachers; throwing books, papers, and furniture when he was angry;

leaving the classroom and wandering about the school building; engaging in six to seven fights;

and engaging in inappropriate sexualized behavior, such as touching a female student's chest and

making sexual comments and gestures.  Ex. 73 at 0014, 0019; Ex. 77 at A0047.  Staff at the

Explore program implemented police interventions, resulting in referrals of the Student to the

---

[1] All references are to the exhibits listed in the Certified Inventory of the Administrative
Record [Docket No. 8].

juvenile justice system.  Ex. 74 at A0416.

### 2.     The Student's Education at the Bell Center

In May 2005, the Parent requested a due process hearing.  The matter was settled without a hearing when the Parent and the District agreed to a new IEP for the Student's tenth grade 2005-2006 school year.  Ex. 46.  The 2005-2006 IEP was developed based on a May 2005 independent educational evaluation by Dr. Ziegler and a June 2005 functional behavioral assessment by Jan Ostrom ("Ostrom"), the CEO of Brih Design, an independent consulting firm specializing in behavior analysis.  Ex. 77; Ex. 113 at 502-03.  The 2005-2006 IEP was the first IEP that attempted to address the Student's behavioral and learning disability issues.  Ex. 113 at 369-71.  The 2005-2006 IEP set goals and objectives for reading, writing, math, and social skills development such as understanding boundaries and peer relationships.  Ex. 46 at A0122-26.  The IEP called for individual and group counseling, music therapy, paraprofessional support, and behavioral support.  Id. at A0127-29.  The IEP provided that the Student would receive these services at the Bell Center, a Setting IV program in Coon Rapids, Minnesota, for students with serious emotional and behavioral needs.  Ex. 46; Ex. 115 at 911.  The Student's Parent consented to the 2005-2006 IEP.  Ex. 46 at A0116.

During the summer of 2005, the District provided the Student with extended school year ("ESY") services at the Bell Center.  Ex. 115 at 920.  The Student received one-and-a-half hours of daily instruction during school days for six weeks.  Id.  The services consisted of academic instruction, music therapy, and physical education.  Id. at 920-21.

Dorothy Webb ("Webb") was the Student's case manager and teacher during the 2005-2006 school year.  Ex. 112 at 126-27.  Webb was assisted in the classroom by two

paraprofessionals.  Id. at 118.  The Student and six other students spent the majority of their day in Webb's classroom.  Id. at 119.  Each student had a desk located in a central area with the other students' desks, and each student was also assigned a carrel where the student could sit alone. Id. at 116.

Bell Center staff use a team approach to implement a student's IEP.  Id. at 129.  The team responsible for implementing the Student's IEP included Program Supervisor Vickie Pitney ("Pitney"), Webb, the two paraprofessionals, Behavior Intervention Specialist Julie Maass-Hanson ("Maass-Hanson"), High School Lead Laura Hendricks, and Counselor Heather Brenden ("Brenden").  Ex. 46 at A0137; Ex. 114 at 664, 672-73, 816.  The team developed a behavior intervention plan ("BIP") to decrease the Student's inappropriate verbal comments, social antics, physical aggression, property destruction, sexualized behavior, and non-compliance with staff requests.  Ex. 46 at A0133-39.  The BIP provided that "[s]taff will use differential reinforcement by attending to [the Student] when he is exhibiting desirable behaviors" and by "refrain[ing] from attending to [the Student] when he is exhibiting less desirable behavior unless it is of safety concern."  Id. at A0135.  When it was necessary to redirect the Student, staff was to do so without discussing the Student's behavior or engaging in a power struggle.  Id.  Additionally, the BIP provided that the Student would have access to a smaller one-to-one learning environment that he could go to when he became distracted or otherwise unable to meet expectations.  Id.  If the Student wandered off, a paraprofessional would follow him and allow him to wander for ten minutes as long as he did not cause a safety issue.  Id. at A0136.  If the Student presented a safety issue or would not return to a designated area after ten minutes, he would be "day-ended" (i.e. sent home).  Id. at A0135.  The Student's IEP provided that his school day would end at

1:25 p.m., one class period earlier than full day.  Id. at A0131.

During the first quarter of the 2005-2006 school year, the Student was motivated and performed beyond expectations.  Ex. 112 at 193-94.  The Student's November 9, 2005, first quarter report card reflected A's in Self Improvement, Physical Education, and Math, a B in Science, and a C in English.  Ex. 48.  The goal summary section of the accompanying progress report reflected a range of eighty-four to ninety-five percent for the ten behavior goals listed in the IEP: following directions; ignoring others; appropriate language; show respect; verbal physical aggression; keep current; positive interaction; on-task; use good social skills; and proper use of materials.  Ex. 49.

As specified by the IEP, the Student's Core team held monthly meetings in September, October, and November 2005 with the Parent and the Student to review the Student's academic and behavioral performance.  Ex. 46 at A0129; Exs. 50-52.  During these meetings, the Parent and the Bell Center staff communicated well and everyone was encouraged by the Student's performance.  Ex. 112 at 45, 190-92.  Based on the Student's performance and the Student's desire to attend a full day of classes, the Core team and the Parent agreed that the Student would attend a full day beginning in the second quarter.  Ex. 53.  After attending the first two Core team meetings, Ostrom, the independent consultant, ceased attending because she believed she was no longer needed.  Ex. 113 at 541-42.  She notified Bell Center staff that they should call her if academic performance or behavioral issues occurred.  Id. at 612.

During the second quarter, the Student's academic performance and behavior began to deteriorate.  Ex. 112 at 211.  His January 25, 2006, report card reflected a B in Math, a D+ in Horticulture, D's in Science and Art, and an F in English.  Ex. 55.  Webb's comments in the

accompanying progress report note that the Student was frequently off task and disrespectful, he frequently left class to go to the nurse's office or the bathroom, and he did not complete his homework assignments.  Ex. 54.  Despite these comments, the goal summary section of the report card reflected only slight decreases in the percentages for the ten behavior goals.  Whereas the range of the November 9, 2005, goal summary was eighty-four to ninety-five percent, the range of the January 25, 2006, goal summary was seventy-nine to ninety-three percent.  Compare Ex. 49 with Ex. 54.

The Student's grades and behavior further deteriorated during the remainder of the 2005-2006 school year.  His February 27, 2006, progress report reflected F's in all six of his classes.  Ex. 56.  The comments section noted that the Student was engaging in oppositional behavior; he was not following school rules; he was wandering; he was day-ended twice and he received several in-school suspensions for not following school rules and for refusing to work in class.  Id.  The range for his goal summary fell to sixty-one percent to eighty-three percent.  Id.  On February 28, Bell Center staff revised the Student's BIP to reflect the increasing behavior problems.  Ex. 61.  The revised BIP did not include new interventions.  Id.

The Student's March 29, 2006, third quarter report card reflected a C, a C-, a D, and three F's.  Ex. 58.  The comments section noted that the Student had disrespected "students and staff by using unacceptable names and profanity when addressing them."  Id.  The Student had refused to work or follow directions, he frequently wandered, and he often disrupted class.  Id.

The Student's May 22, 2006, progress report reflected that the percentages for his behavioral goals had fallen to between forty-seven percent and sixty-five percent.  Ex. 59.  Webb's comments noted that the Student had difficulty functioning in the self-contained

classroom, he was extremely disruptive and unable to identify his wants or needs, and he often used profanity and acted out. <u>Id.</u> The Student's fourth quarter report card listed six F's. Ex. 60.

The Student's increasing behavioral issues were also reflected in behavior incident reports and critical incident reports compiled by Bell Center staff. Staff documented 91 behavior incidents for the Student in the first quarter, 103 incidents in the second quarter, 227 incidents in the third quarter, and 304 in the fourth quarter. Ex. 85 at A0243. Additionally, Bell Center staff compiled critical incident reports of situations where the Student's behavior caused a safety issue, a significant disruption of the learning environment, or resulted in a suspension from school. Ex. 115 at 951. Staff documented one critical incident regarding the Student in the first quarter, none in the second or third quarters, and five in the fourth quarter. Ex. 88.

Beginning in February 2006, the Bell Center's police liaison officer interacted with the Student during some of his behavior incidents. The police liaison officer was present during three incidents in February, three incidents in March, one incident in April, five incidents in May, and two incidents in June. Ex. 115 at 967; Ex. 64 at C0118, C0160; Ex. 68 at C0007-08, C0010, C0014, C0016-17; Ex. 71; Ex. 88 at B0123, B0137-39, B0143, B0148. Bell Center staff requested the officer's presence during two incidents in February and one incident in April. Ex. 68 at C0007-08, C0012. On the other occasions staff apparently did not request the officer's assistance but the officer was present in the location where the Student wandered and she responded because she perceived safety issues. In February or March 2006, Pitney and Maass-Hanson requested that the police liaison officer remove herself from the Student's vicinity whenever possible because the Student was intentionally seeking out the officer to provoke a response and engage her in a power struggle. Ex. 114 at 841-42; Ex. 115 at 968. The officer

agreed to remove herself unless she perceived a safety issue.  Ex. 114 at 841-42.  The officer

subsequently ignored many of the Student's provocations.  Id. at 811; Ex. 115 at 968.

Julie Maass-Hanson, the behavior interventionist at the Bell Center, met occasionally

with the Student during the first two quarters and more often in the third and fourth quarters as

the Student's behavior deteriorated.  Ex. 114 at 832-33.  In the spring of 2006, Maass-Hanson

prepared a draft BIP.  Ex. 114 at 849; Ex. 83.  Based on data from the Student's behavior

incidents, Maass-Hanson determined that the Bell Center staff's two most frequent methods of

intervention—ignoring negative behavior and redirecting the student—were both as likely to

result in escalation of the behavior as they were likely to result in the negative behavior stopping.

Ex. 114 at 890.  She testified that staff called the police liaison officer only when they believed

they could not safely control a situation.  Id. at 837-38.

Heather Brenden, the social worker at the Bell Center, was the Student's counselor.  Id.

at 664, 670.  Brenden spent time with the Student in the classroom and the gym, and she also met

with the Student weekly for one-on-one counseling.  Id. at 672-74.  Brenden felt she was unable

to develop a close bond with the student because she never learned about the Student's home

life.  Id. at 693.  Brenden and Webb met informally to discuss issues regarding the Student's

behavior, and staff met formally from time to time.  Id. at 679-80.

During the school year, the Bell Center staff implemented interventions and adaptations

to address the Student's deteriorating behavior and performance.  Webb used a visual schedule

and sound field system in the classroom, but abandoned the sound field system when the Student

expressed his displeasure with it.  Ex. 112 at 163-64.  In February 2006, Webb spoke with the

Parent about having an advocate mentor the Student.  Id. at 227.  The Parent agreed and the

advocate, Kenny Maxey ("Maxey"), began meeting with the Student once a week.  Id. at 228.
The Student and the advocate engaged in activities such as shootings hoops so that they could
develop a positive relationship.  Id. at 228-29.  The Student enjoyed these meetings and
eventually the Student and Maxey met twice a week.  Id. at 228-32.

The staff used differential reinforcement, attempted to ignore negative behavior, and
redirected the Student and gave him space to make his own decisions, rather than engage in
power struggles.  Ex. 114 at 683-84.[2]  Staff sought the Student's views and allowed him to go to
a separate room for one-on-one instruction whenever he desired.  Id. at 682-86.  The staff added
physical education to the Student's schedule.  Id. at 800.  In March 2006, the Bell Center staff
adjusted the Student's schedule, with the Parent's consent, so that he would start his day with
one-on-one instruction before entering Webb's classroom.  Ex. 112 at 203, 235.  In May 2006,
the staff moved the student from Webb's self-contained classroom to a mainstream schedule so
that he could experience more variety by moving among different classrooms.  Ex. 114 at 734.

In February 2006, the Student began one-on-one after school tutoring for four hours per
week at the Sylvan Learning Center.  Ex. 115 at 1117, 1134.  Christel Petrowitsch
("Petrowitsch") worked with the Student on reading and math.  Id. at 1117.  Although the
Student sometimes refused to work, Petrowitsch testified that he did not demonstrate any
significant behavior problems.  Id. at 1132.  The Student did not attend Sylvan during the
summer of 2006, but he resumed in the fall.  Id. at 1111-12.  The District paid for the tutoring at
Sylvan Learning Center.  Id. at 1123.

During the 2005-2006 school year, Bell Center Staff communicated with the Parent

---

[2] Unfortunately, the effectiveness of a given intervention was unpredictable from one day
to the next. Ex. 114 at 680.

through telephone calls, progress reports, and meetings.  Ex. 112 at 245-46.  As previously

described, all parties were positively engaged during the first two quarters.  However, at Core

team meetings in the third and fourth quarters, when the Student's grades and behavior were in a

downward spiral, the Parent was less engaged, used negative body language, wore sunglasses,

and left meetings early.  Ex. 114 at 859; Ex. 115 at 933-35.  Contrary to December 2005 when

the Parent came to school and intervened to help the Student get focused, she did not follow up

on the Core team's suggestion in February 2006 that she make impromptu visits to the Bell

Center to observe the Student at school.  Ex. 112 at 212-14; Ex. 115 at 946; Ex. 87.  In March

2006, Webb spoke to the Parent about ESY classes for the summer.  Ex. 112 at 215-16.  The

Parent never responded to the ESY inquiry.  Id. at 216.

The record reflects that the Parent became disengaged around February when the Student

began having encounters with the police liaison officer.  Ex. 114 at 899.  The Parent testified that

Bell Center staff should not have involved the police unless the Student jeopardized the safety of

others.  Ex. 112 at 48-50.  The Parent testified that she requested that Bell Center staff call her

first before involving the police.  Id. at 50-51.  Another cause of the Parent's disengagement may

have been the February 2006 filing by the Bell Center of a truancy report with the Anoka County

Corrections Department.  Exs. 66-67.  Webb and Pitney believed that the Bell Center was

required by state law to record and report the Student as truant.  Ex. 112 at 298; Ex. 115 at 1006.

### 3.     The June 2006 IEP

In June 2006, the Bell Center team prepared a new IEP based on an updated functional

behavioral assessment and a comprehensive reevaluation conducted by Bell Center staff.  Ex.

114 at 853-56; Exs. 80, 85.  Although Webb and Pitney contacted the Parent to arrange an IEP

meeting, the Parent failed to follow up on scheduling a meeting.  Ex. 115 at 971.  Bell Center

staff notified the Parent by telephone and by mail that a June 15 IEP meeting was scheduled.  Ex.

90 at A0287-88.  The Parent and the Student did not attend.  Id. at A0309.  Bell Center staff

revised the IEP and the BIP at the June 15 meeting.  Ex. 90.

### 4.      The Parent's Request for a Due Process Hearing and Subsequent Events

The Student returned to the Bell Center for the 2006-2007 school year but the Parent

withdrew him after the Student was arrested on September 15, 2006.  Ex. 115 at 981-85.

Officers arrested the Student after he disobeyed instructions to leave the lunch room, kicked

recycling bins, and resisted the police liaison officer's attempt to place him in handcuffs.  Id.

On September 20, 2006, Plaintiffs requested a due process hearing from the District.  Ex.

1.  Plaintiffs alleged a lack of appropriate evaluation, services, and placement, and they sought

an independent educational evaluation, an IEP that included placement in an individual tutoring

program, and compensatory education services.  Id.  The parties resolved most of these issues

before the hearing.  As a result of the settlement, the District provided homebound tutoring and

continued to provide tutoring at Sylvan Learning Center.  Ex. 74 at A0415.  The unresolved

issue was whether the District should be required to provide compensatory education services

because of the shortcomings Plaintiffs alleged regarding the 2005-2006 school year.

The ALJ requested that Dr. Ziegler update his May 2005 neuropsychological

examination of the Student and asked Ostrom to update her June 2005 functional behavioral

assessment.  Dr. Ziegler's January 22, 2007, report attributed the Student's declined functioning

in the 2005-2006 school year to:

(1)      Bell Center staff failed to consult with Ostrom after the Student's performance
         began to deteriorate.  Ostrom may have been able to provide unique insight

because she had conducted the 2005 functional behavior analysis.  Ostrom's presence on the Core team as an independent consultant might have increased the Parent's confidence.

(2)     The Student perceived changes in how the staff treated him, but neither he nor his mother effectively articulated the Student's perceptions to the Bell Center staff.

(3)     The level of trust declined between the Student, the Parent, and the Bell Center staff.  The Parent viewed the involvement of the police liaison officer as a "replay" of the failures at the Explore Program.  As a result, the Parent's confidence in Bell Center staff eroded and the Student's motivation to perform may have decreased when he perceived his Parent's diminished trust.

(4)     The Parent failed to follow through on Dr. Ziegler's 2005 recommendation that the Student receive psychiatric therapy or medication, and that the student receive sexuality specific treatment to increase the Student's awareness of sexually appropriate boundaries.

Hrg. Ex. 74 at A0431-33.  Dr. Ziegler recognized that Bell Center staff attempted numerous interventions to improve the Student's functioning and characterized these efforts as laudable. Id. at A0430-A0431.  Dr. Ziegler's report noted that testing of the Student in January 2007 revealed improvements in the Student's raw scores in all academic domains and on measures of higher order receptive and expressive language, when compared to similar testing in May 2005. Id. at A0433.  While still lagging well behind his peers, the Student's standard scores declined slightly in reading but improved slightly in math, written expression, and language.  Id. at A0437; Ex. 113 at 487.  Dr. Ziegler noted that test scores suggested that the student "benefited, at least to some degree, from the services that he received at Bell Center, from his homebound tutoring, and from the tutoring . . . at Sylvan Learning Center[]."  Ex. 74 at A0433.

Ostrom's January 22, 2007, report found that the frequency and severity of the Student's behavioral incidents actually decreased during the 2005-2006 year at the Bell Center as compared to the 2004-2005 year at the Explore program.  Ex. 78 at A0443; Ex. 113 at 604.  The

large number of incidents reported by the Bell Center was due to its method of reporting the ongoing behavior within a short time span as a series of separate incidents. Ex. 113 at 607. Ostrom's updated functional behavioral assessment identified two variables as responsible for the decline in the Student's behavior during the 2005-2006 school year. Ex. 78 at A0450-51. First, Ostrom identified a lack of adequate communication and collaboration in supporting the student. Id. at A0450. The Student was more likely to participate at school when his Parent supports the educational efforts. Id. Collaboration between the Parent and the Bell Center staff was undermined because the Student told his Parent stories about incidents that were significantly different from the perceptions of the Bell Center staff. Id. Second, Ostrom concluded that the presence and intervention of the police liaison officer may have contributed to the Student's deteriorating behavior. Id. at A0451. The Student was aware of and emboldened by the history of litigation regarding police intervention. Id. As a result, the Student sought out and taunted the police liaison officer. Id. Ostrom was concerned that the Student was taunting the officer in an effort to negatively impact communication and collaboration between Bell Center staff and his Parent. Id.

At the hearing, the ALJ heard the testimony of the Parent, Webb, Dr. Ziegler, Ostrom, Brenden, Maass-Hanson, Pitney, and Petrowitsch. The ALJ concluded that the District satisfied its procedural and substantive obligations under IDEA for the 2005-2006 school year. Therefore, the ALJ found the Student was not entitled to compensatory education services. On September 19, 2007, Plaintiffs timely initiated this action challenging the ALJ's decision.

## III. DISCUSSION

**A.     Standard of Review**

In a motion for judgment on the record brought pursuant to the IDEA, a district court must review the state administrative record and grant such relief as it deems appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2); CJN ex rel. SKN v. Minneapolis Pub. Sch., 323 F.3d 630, 636 (8th Cir. 2003).  "Although a district court should independently determine whether the child has received a FAPE, it must give 'due weight' to agency decision-making."  CJN, 323 F.3d at 636.  "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense."  Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997).  Rather, a school district satisfies its obligations under the IDEA if: (1) it complies with the Act's procedural requirements and (2) the IEP is "reasonably calculated to enable the child to receive educational benefits."  Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 (1982).  A party challenging the implementation of an IEP must demonstrate that the school authorities failed to implement a substantial or significant portion of the IEP.  Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) (noting distinction between a challenge to an IEP and a challenge to the implementation of an otherwise appropriate IEP).

**B.     Burden of Persuasion**

Consistent with Minnesota law, the ALJ placed the burden of persuasion on the District during the due process hearing.  Minn. Stat. § 125A.091, subd. 16.  The District argues this was error under Eighth Circuit precedent.  The Supreme Court has held that where state law is silent, the burden of proof in a due process hearing under IDEA is properly placed on the party seeking

relief.  Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528, 537 (2005).  The Supreme Court did not address whether a State could always place the burden on the school district, as Minnesota does through Minn. Stat. § 125A.091, subd. 16.  The Eighth Circuit has held that Schaffer requires the burden of proof in a due process hearing under IDEA to be placed on the party seeking relief even in states that purport to place the burden always on school districts.  M.M. ex rel. L.R. v. Special Sch. Dist. No. 1, 512 F.3d 455, 458-59 (8th Cir. 2008); Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett, 440 F.3d 1007, 1010 n.3 (8th Cir. 2006).  Therefore, federal law preempts Minn. Stat. § 125A.091, subd. 16 to the extent it places the burden of proof in an IDEA due process hearing always on the school district.

"Placing the burden of proof on the incorrect party is reversible error unless the error relates to an immaterial issue."  M.M., 512 F.3d at 459 (quotation omitted).  Here, the ALJ erred in placing the burden of proof on the District but the error was harmless because the District prevailed.  Nevertheless, the District requests that the burden of persuasion be placed on Plaintiffs for purposes of this Court's review.  Given the strength of the District's evidence, this Court finds the outcome of its analysis is the same regardless of the placement of the burden of persuasion.

**C.      Whether the District Complied With the IDEA**

**1.      Alleged Procedural Violations**

Plaintiffs allege that the District committed a number of procedural violations of IDEA that denied a FAPE to the Student.

**a.      Progress Reports**

Plaintiffs assert that the District committed a procedural violation of IDEA and analogous

16

Minnesota law by failing to provide timely and adequate progress reports to the Parent.  See Pls.'

Mem. in Supp. of Mot. for J. [Docket No. 19] at 27-28; 20 U.S.C. § 1414(d)1)(A)(i)(iii); Minn.

R. 3525.2810, subp. 1(A)(9).  The ALJ concluded that the District provided timely and adequate

progress reports to the Parent.  ALJ's Decision at 27.

The record reflects Bell Center staff sent the Parent progress reports and report cards

twice per quarter.  Exs. 47-49, 54-56, 58-60.  In addition to listing the Student's grades, these

reports documented the Student's performance in the ten behavioral goals identified in the IEP,

and the reports included comments regarding the Student's behavior.  In addition to the report

cards and progress reports, Webb made at least sixty phone calls to the Parent regarding issues at

school.  Ex. 62.  Webb sent the Parent daily tracking sheets when the Parent requested them.  Ex.

112 at 245.  With the exception of December 2006, the Core team met each month from

September 2005 through May 2006.  Ex. 115 at 926.

On this record Plaintiffs' argument that the District did not provide timely and adequate

progress reports to the Parent during the 2005-2006 school year is rejected.

**b.      Use of Redirection**

Plaintiffs next argue that the District failed to faithfully implement the 2005-2006 IEP

and BIP after the first quarter.  To prevail on this claim Plaintiffs must demonstrate that the

District failed to implement a substantial or significant portion of the IEP.  Neosho R-V Sch.

Dist., 315 F.3d at 1027 n.3.

Plaintiffs contend that Bell Center staff did not implement the positive behavioral

strategies identified in the BIP.  Although Plaintiffs concede that the District appropriately

implemented the IEP during the first quarter, they argue that behavior incident reports from the

first quarter show that the only intervention Bell Center staff employed was redirecting the

Student.  Pls.' Mem. at 9-10; Ex. 64 at 129-32.  However, Plaintiffs overlook other reports from

the first quarter reflecting that Bell Center staff employed other interventions, such as time-outs,

ignoring the Student's negative behavior, and allowing him to leave the classroom to receive

one-on-one services.  Ex. 64 at 0020, 0022, 0026, 0028-29, 0034-35, 0042.

Additionally, Brenden and Maass-Hanson testified that throughout the 2005-2006 school

year, Bell Center staff used interventions such as differential reinforcement, ignoring negative

behavior, allowing the Student to leave the classroom and receive one-on-one services, sending

the Student to receive one-on-one services, and listening to the Student's perspective on a given

situation.  Ex. 114 at 677-89, 836-37.  Pitney and Brenden testified that despite the use of these

interventions, redirection was often necessary and the staff followed the strategy outlined in the

BIP for redirecting the Student.  Ex. 114 at 683; Ex. 115 at 1050.

Plaintiffs argue that other behavior code report spreadsheets are evidence that Bell Center

staff did not implement the interventions listed in the BIP.  Pls.' Mem. at 11 n.8.  However, both

Ostrom and Brenden testified that Bell Center's records generally omitted proactive strategies

that were employed.  Ex. 113 at 615; Ex. 114 at 755.  Although better documentation of the

proactive strategies would be helpful, the Court finds based on all the evidence in the record that

the Bell Center staff adequately implemented the intervention strategies in the IEP and BIP.

### c.      Provision of One-On-One Services

Plaintiffs argue the District did not provide one-one-one instruction called for by the

2005-2006 IEP.  Pls.' Mem. at 15.  The IEP stated that "[the Student] needs access to a smaller

alternative learning environment for parts of the day for direct 1:1 academic instruction . . . when

he is struggling to follow through on expectations or appears to be highly distracted."  Ex. 46 at

A0135.  The IEP directed that the Core team should increase the Student's one-on-one services if

the frequency of problem behaviors increased.  Id. at A0137.  The IEP did not specify an amount

of one-on-one instruction the Student should receive.

Plaintiffs allege that Bell Center staff improperly reduced the Student's level of one-on-

one instruction during the first quarter.  Pls.' Mem. at 15-17.  However, Plaintiffs' citation to the

record does not support this allegation, and there does not appear to be testimony or

documentary evidence that the Bell Center reduced the Student's one-on-one instruction time.

Id. at 16; Ex. 112 at 199.  Plaintiffs also allege that Bell Center staff failed to increase the

Student's one-on-one instruction when behavioral issues increased in subsequent quarters.  Pls.'

Mem. at 15-17.  However, in March, Bell Center staff proposed that the Student begin his day

with one-on-one instruction and the Parent agreed.  Ex. 112 at 235-236.  Further, Brenden

testified the Student frequently received one-on-one instruction.  Ex. 114 at 815.

On this record, the Court finds that the District provided one-on-one instruction

consistent with the terms of the 2005-2006 IEP.

### d.      Failure to Reevaluate the Student and to Revise the IEP

Plaintiffs also argue the District violated IDEA by failing to reevaluate the Student or

adequately review and revise the Student's IEP.  Pls.' Mem. at 27.  Regarding reevaluation, the

Court finds the record supports the ALJ's conclusion that the District reevaluated the Student as

necessary.  IDEA requires a school district to reevaluate a child if the district determines that the

educational needs of the child warrant a reevaluation.  20 U.S.C. § 1414(a)(2)(A)(i).  A

reevaluation must occur at least once every three years, but not more than once a year unless the

parent consents.  20 U.S.C. § 1414(a)(2)(B).  Immediately prior to the Student's enrollment at

the Bell Center, the District paid for an independent reevaluation of the Student in the summer of

2005.  The District began a functional behavioral assessment in the spring of 2006.  Ex. 85; Ex.

114 at 849-56.  The District performed another reevaluation in June 2006.  Ex. 80.  Plaintiffs

contend that the District should have conducted a reevaluation in early 2006 because of the

Student's deteriorating academic and behavioral performance.  However, the Student's learning

problems and behavioral issues were identified in the reevaluation that was completed

immediately prior to the 2005-2006 school year.  On this record, the Court finds the frequency of

the District's reevaluations did not violate IDEA.

Plaintiffs also argue the District did not adequately review and revise the Student's IEP.

IDEA specifies a school district must review a child's IEP "periodically, but not less frequently

than annually."  20 U.S.C. § 1414(d)(4)(A)(i).  A school district must revise an IEP as

appropriate to address circumstances such as a lack of progress.  20 U.S.C. §

1414(d)(4)(A)(ii)(I).  After reviewing the record, the Court finds the Plaintiffs have failed to

demonstrate that the District did not adequately review and revise the IEP.  Although the

Student's IEP was not formally revised during the 2005-2006 school year, the District made

several attempts to adjust the educational services within the framework of the existing IEP.

Some examples are the addition of a mentor advocate in February 2006, the increased

involvement of Maass-Hanson beginning in February 2006, the shift in March 2006 to begin the

Student's day with one-on-one instruction, and the Student's shift to a schedule with different

classrooms in May 2006.  Given the success the Student experienced in the first quarter, and the

fact that the 2005-2006 IEP and BIP addressed the problematic behaviors that occurred in the

last three quarters, it was entirely reasonable for the staff to work within the existing IEP.  The

District did not violate IDEA by failing to modify the IEP during the 2005-2006 school year.

### e.      Referral to the Police Liaison Officer and Truancy Reporting

The ALJ determined that "[t]he core of [Plaintiffs'] case is [the] contention that the

District's involvement of the police liaison deprived the Student of FAPE."  ALJ's Decision at

22.  Based on the few incidents during which Bell Center staff requested assistance from the

police liaison officer, the Student's repeated attempts to provoke the officer, and Pitney and

Maass-Hanson's request that the Police Liaison officer try to avoid interacting with the Student,

the ALJ found that the District neither improperly utilized nor overutilized the police liaison

officer and other authorities.  Id. at 22-24.

Plaintiffs respond that the use of police officers is not the core of their case, but is instead

a symptom of the District's alleged failures to implement the Student's IEP and BIP.  Pls.' Mem.

at 25.  However, Plaintiffs continue to assert that the District overused police officers and

improperly referred the Student for truancy prosecution.  Id.  After reviewing the record, the

Court concurs with the ALJ's conclusion that Bell Center staff did not overuse the police liaison

officer.

Regarding truancy prosecution, the District has argued that it was required by law to

report the Student when he missed too much class time due to his wandering and other

behaviors.  Plaintiffs contend that Minnesota law does not require truancy reporting of a student

with behavioral disabilities that cause him to wander.  Plaintiffs argue it was implicit in the

settlement that led to the 2005-2006 IEP that the District would not refer the Student for truancy

proceedings in juvenile court.  However, the IEP does not explicitly prohibit truancy referrals.

Although Ostrom was critical of the truancy referrals, this Court finds that the truancy referrals did not amount to a substantial failure to implement the IEP.  Ex. 113 at 627.

      **f.**      **Failure to Consult With Brih Design**

The 2005-2006 IEP stated that the Bell Center staff would include Ostrom in Core team meetings.  Ex. 46 at A0135.  During the first quarter Ostrom decided her presence was unnecessary for Core team meetings and told the Bell Center staff to call her if issues arose regarding the Student's behavior.  Bell Center staff did not consult her again during the 2005-2006 school year.  While Dr. Ziegler testified that Ostrom's presence may have been beneficial, the ALJ correctly concluded that the failure to reinvolve Ostrom did not significantly impact the District's implementation of the IEP because the District had its own behavior specialist, Maass-Hanson, who worked with staff members to implement the strategies specified by the BIP.  ALJ's Decision at 26.

In summary, the Court agrees with the ALJ that the record does not support any of Plaintiffs' claims of procedural violations of IDEA.

**D.**      **Lack of Success**

Plaintiffs also argue that the District did not provide a FAPE for the Student because the District's educational services for the Student failed to produce meaningful educational benefits and progress in the general curriculum.  However, the Supreme Court has held that IDEA only requires that a school district design and implement an IEP that is "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 206-07.  The Eighth Circuit has held that although academic progress is an important factor, IDEA does not "guarantee that the student actually make any progress at all."  CJN, 323 F.3d at 642.

The parties dispute whether the Student received any educational benefit from his 2005-2006 year at the Bell Center.  The District argues that the Student received an educational benefit.  The District relies on: (1) the Student's good performance during the first quarter; (2) the Student's January 2007 standardized test results showing steady performance or small improvements relative to his peer group in reading, math, written expression, and language; and (3) Ostrom's testimony that the frequency and severity of the Student's behavioral incidents decreased in 2005-2006 when compared with the 2004-2005 year in the Explore program. Defs.' Mem. at 25-27.  In response, Plaintiffs argue that: (1) the Student regressed after the first quarter, wiping out any gains he may have achieved; and (2) the test results could be attributable to the tutoring services the Student received at the Sylvan Learning Center in the spring and fall of 2006, as well as the homebound services the Student received in the fall of 2006.

The Court finds it is unnecessary to analyze whether the evidence supports the ALJ's determination that the Student demonstrated academic or behavioral progress as a result of the services provided by the Bell Center.  At oral argument, Plaintiffs' counsel conceded that the Student's 2005-2006 IEP was appropriate and reasonably calculated to benefit the Student.  This Court has determined that the District's implementation of the IEP did not violate IDEA. Although it is unfortunate that the Student's grades and behavior regressed after the first quarter of the 2005-2006 school year, the District cannot be liable where both the IEP and the implementation of the IEP complied with IDEA.  See CJN, 323 F.3d at 642 (stating that IDEA does not guarantee educational progress).

The Court finds that the Eighth Circuit precedents relied on by Plaintiffs are distinguishable from the case at bar.  Plaintiff relies on Independent School District No. 284 v.

A.C., 258 F.3d 769, 777 (8th Cir. 2001), for the proposition that a school district must provide services that address a disabled child's emotional and behavioral problems if those problems would otherwise prevent the child from learning.  Here, the Student's 2005-2006 IEP and BIP did address the Student's emotional and behavioral problems, and this Court has concluded that the District adequately implemented the IEP and the BIP.  Plaintiffs also rely on Neosho R-V School District, where the Eighth Circuit concluded that the IEP at issue "did not appropriately address [the child's] behavior problem." 315 F.3d at 1028.  The case at bar is distinguishable because Plaintiffs have conceded that the Student's IEP and BIP were appropriate.

The Court concludes that the District committed neither a procedural nor a substantive violation of IDEA during the 2005-2006 school year.  Accordingly, the Student is not entitled to compensatory education services.  The District's Motion for Judgment on the Record is granted, and Plaintiffs' Motion is denied.

**IV. CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.   P.K.W.G., a minor child, by and through his parent and natural guardian,

     Gwendolyn Gilmore's Motion for Judgment on the Record [Docket No. 17] is

     **DENIED**; and

2.   Defendants Independent School District No. 11, Anoka-Hennepin School District;

     Anoka-Hennepin Board of Education; Mark Sullivan; and Roger M. Giroux's

     Motion for Judgment on the Record [Docket No. 13] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

                    BY THE COURT:


                    _____s/Ann D. Montgomery_____
                    ANN D. MONTGOMERY
                    U.S. DISTRICT JUDGE

Dated:  June 11, 2008.

25